UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


REBECCA A. PICKLE,            )
                                      )
       Plaintiff,           )
                                        )
       v.                  )      No.   4:13CV949 TIA
                                        )
CAROLYN W. COLVIN, Commissioner  )
of Social Security,              )
                                        )
                   Defendant.     )

## MEMORANDUM AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration. The suit involves an Application for Disability Insurance Benefits under Title II of the Social Security Act. Claimant has filed a Brief in Support of her Complaint; the Commissioner has filed a Brief in Support of her Answer; and Claimant filed a Reply thereto. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.    Procedural History

Claimant Rebecca A. Pickle filed Applications for Disability Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 168-77).[1] Claimant states that her disability began on November 2, 2007,[2] as a result of degenerative disc disease of lumbar 4 and lumbar 5 vertebrae. (Tr. 90). On initial consideration, the Social Security Administration denied Claimant's claims for benefits. (Tr. 90-95). Claimant requested a hearing before an Administrative Law

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer (Docket No. 11/filed August 2, 2013).

[2]On December 5, 2011, Claimant filed a Notice of Amended Onset changing the onset date from October 15, 2007 to November 2, 2007. (Tr. 178, 199).

Judge ("ALJ").  On October 22, 2009, a hearing was held before the ALJ who issued an unfavorable decision on December 22, 2009.  (Tr. 28-47, 73-81).  Thereafter, Claimant filed a Request for Review of Hearing Decision, and the Appeals Council granted the request for review, vacated the hearing decision, and remanded the case to the ALJ to address certain matters on March 18, 2011.  (Tr. 86, 87-89).  In relevant part, the Appeals Council directed the ALJ to resolve the following:

> The record is unclear regarding the nature and severity of the claimant's mental impairment(s).... Specifically, the claim file does not contain an assessment from a consultative examiner, treating physician, or a medical source from the State Agency on the claimant's mental status.
>
> ...Specifically, the hearing decision indicates, in part, that the medical record for the post-February 2009 period does not show any visits to a psychiatrist, psychologist, or a therapist.  A review of the records, however, shows that the claimant has been receiving mental health treatment via various medications for fluctuations in her mood from her treating physician, Philip Dean, M.D.  Rationale with cited medical evidence is needed to support why the claimant's alleged mental impairment does not meet the duration requirement.
>
> Update the medical evidence on the claimant's impairments in order to complete the administrative record ... regarding consultative examination and existing medical evidence....
>
> Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations.
>
> Further, evaluate the claimant's subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms.
>
> Further, evaluate the claimant's mental impairment(s) in accordance with the special technique described in 20 CFR 404.1520a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas...
>
> If warranted by the expanded record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base.

(Tr. 87-88) (internal citations omitted).

On December 5, 2011, a supplemental hearing was held before an ALJ. (Tr. 48-70). Claimant testified and was represented by counsel. (Id.). Vocational Expert Delores Gonzalez also testified at the hearing. (Tr. 61-67, 133-36). Thereafter, on March 12, 2012, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 12-21). The Appeals Council on March 21, 2013 found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision after considering the brief of representative. (Tr. 1-6, 260-63). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.  Hearing on October 22, 2009

#### 1.  Claimant's Testimony

At the hearing on October 22, 2009 , Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 28-47). Claimant lives in her parents home with her parents, two sisters, and her son in a single family home. (Tr. 31).

Claimant testified that she attended outpatient treatment at Alternative Behavioral Care for prescription abuse in 2006, but the ALJ noted how she needs to provide the records supporting her prescription drug abuse problem. (Tr. 34-38). She testified that she has severe back pain from a herniated disc. (Tr. 38). After she had a microdiscectomy in 2005, her pain did not improve and increasingly escalated to the point where cannot bend or stand for more than one or two hours at a time. Claimant testified that she is either on the couch 24/7 or in the emergency room. After her second surgery, she indicated that she is in bed two to three days a week. (Tr. 38). She experiences debilitating side effects from the medications such as dizziness and

drowsiness. (Tr. 39). Ms. Hammond, a therapist at Psych Care Consultants, has treated her after her recent divorce and but not the last couple of months due to her loss of insurance. (Tr. 39).

In response to the ALJ noting her history of opioid dependence, Claimant explained how it was related to her back pain. (Tr. 39). Claimant can lift a gallon of milk and is able to bathe on her own. (Tr. 41). She cooks, shops for brief periods, and drives. (Tr. 41). She does her own personal finances and for exercise does some light stretching. (Tr. 42) . Her hobbies include watching television, playing board games with her son, and helping her son with his homework. She has a lot of friends and family, and she visits. (Tr. 42). After picking her son up from school, she may take him to get ice cream or go to the toy store for twenty to thirty minutes. (Tr. 43).

Dr. Dean treats Claimant for failed back syndrome. (Tr. 44). Since the fall of 2008, she has had some repeated hospitalizations for treatment of depression. (Tr. 45). Claimant explained how there was some problem adjusting her depression medications, because she has problems with reactions to medications. Her use of narcotics was during a period of experiencing severe back pain. (Tr. 45).

Claimant testified that she had to give up her nursing license because of narcotics. (Tr. 45). She could not physically work as a nurse or any other kind of employment. (Tr. 46).

## B.  Hearing on December 5, 2011

### 1.  Claimant's Testimony

At the hearing on December 5, 2011 , Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 48-70). At the outset of the hearing, counsel amended the onset date of disability to November 2, 2007 from October 15, 2007. (Tr. 50-51). Claimant lives in her parents home with her parents, and her sister. (Tr. 51). She has a nursing degree, but her license

expired in 2010.  (Tr. 52).

Claimant had one DUI in 2007 and received outpatient treatment for drugs at Alternative Behavioral Care in 2007.  (Tr. 53).  The ALJ noted that the record shows she was also treated in 2006 and 2009 for psychiatric treatment.  (Tr. 54).

Claimant testified that she worked at Barnes-Jewish for three years and stopped working in November 2007.  (Tr. 55).  Counsel indicated that Claimant's diagnosed physical impairments include failed back syndrome, chronic pain, degenerative disc disease, and sleep disorder and her mental impairments include bipolar disorder, major depressive disorder, and anxiety.  (Tr. 55-56). She is not currently being treated by a psychiatrist or psychologist, but Dr. Philip Dean, a neurologist, prescribes her pain medication and psychiatric medications.  (Tr. 56).  She testified that she does not have the money to pay for counseling for her mental impairments.  (Tr. 56). Claimant testified that her narcotic pain medication is the lowest dose of Oxycontin.  (Tr. 59).  In response to the ALJ's question regarding how she is still taking narcotic pain medication even though she is addicted, Claimant explained how she has requested to be weaned off the medication.  (Tr. 59-60).  The ALJ reminded Claimant how her testimony is being compared to the medical records for the purpose of making a credibility determination.  (Tr. 60).  She has not consumed alcohol for three to four years.  (Tr. 60).

Claimant testified that she can shower and dress herself, but on a bad day, she cannot shower.  (Tr. 57).  The ALJ noted how her testimony is differing from the testimony she provided at the previous hearing.  (Tr. 57).  Claimant apologized for giving only testimony as to her present condition not covering a time from her alleged onset date to the present.  (Tr. 58).  She spends a lot of time lying on the coach watching television and about every thirty minutes she changes her

position. (Tr. 59). Claimant testified that she is not able to last eight hours without lying down. She usually has to lie down three to four times in an eight hour day. (Tr. 59).

## 2. Testimony of Vocational Expert

Vocational Expert Delores Gonzalez testified at the hearing. (Tr. 61-67, 133-36). Ms. Gonzalez found Claimant's records and testimony show she has work experience as a nurse. (Tr. 61). Ms. Gonzalez noted how Claimant worked as a registered nurse, classified as medium, skilled work with diabetes education as part of her job duties. (Tr. 62). Based on Claimant's testimony, the nursing skills as she performed them would have ranged from light to medium. (Tr. 64). Ms. Gonzalez listed customer service, bandaging, disinfecting, interviewing, injecting, inoculating, taking pulses, supervisory skills without managerial, clerical, computer skills as transferable work skills. (Tr. 64-65). The ALJ noted how her "medical records suggest that she is functionally limited to light exertional work. She should avoid ropes, ladders, and scaffolding. She can occasionally do stooping, crouching and crawling. She should avoid hazardous heights." (Tr. 66). The ALJ opined that "[a]lthough the claimant has not for quite a while received any type of psychiatric care, despite her allegations of a disabling mental impairment, I will extend to her the lightest possible latitude in developing her functional capacity and limit her to unskilled work." (Tr. 66). Ms. Gonzalez opined with those limitations, Claimant cannot perform any of her past relevant work. (Tr. 66).

The ALJ asked Ms Gonzalez to assume that

a hypothetical individual with the claimant's educational background, vocational profile and residual functional capacity has the ability to perform [any jobs] that exist in significant numbers on a regional and national level? If yes, please identify those jobs by providing the DOT number, the number of positions available on a regional and national level.

(Tr. 66).  Ms. Gonzalez cited an order caller, a light and unskilled job with 2,815,240 jobs available nationally,68,140 available in Missouri, and 31,070 available in the St. Louis metropolitan area; a furniture rental consultant, light and unskilled, with 416.950 jobs available nationally, 7,310 in Missouri, and 4,170 in the St. Louis metropolitan area; and a private company mail clerk, light and unskilled, with 131,750 jobs available nationally, 3,430 in Missouri, and 1,680 in the St. Louis metropolitan area.  (Tr. 66-67).

Claimant's counsel asked Ms. Gonzalez the following:

... if you assume that Ms. Pickle needs to sit and stand frequently and that she can neither sit nor stand for more than 30 minutes at a time, that she needs to lie down several times during an eight-hour day, is she still able to do these three jobs that you identified?

(Tr. 67-68).  Dr. Cook opined

Well, usually people work two hours, take a short break, work another two hours, lunch hour, two hours, break, two hours.  You know, if that's possible, then those jobs could be performed.  The jobs that I cited were done with a sit-stand option, so the person could change positions at will, however, if the person needs to take breaks where the person would need to lie down at will, not within the parameters of the breaks that are normally given, customarily given, then the person would need to be accommodated and not be able to work competitively.

(Tr. 68).  Claimant testified that two hours is the longest she has gone without taking a break to lie down.  (Tr. 68).

### 3. Open Record

At the end of the hearing, the ALJ noted she would leave the record open for three weeks so that counsel could submit records from Barnes-Jewish evidencing her last date she worked. (Tr. 69).  Counsel provided that requested documentation showing that Claimant's employment status had been inactive as of October 5, 2006 at BJC Healthcare.  (Tr. 258).  The evidence

submitted from Lincoln County Medical Center showed she had worked as a part-time registered nurse from September 29, 2006 through December 26, 2006. (Tr. 259).

### 4. Forms Completed by Claimant

In the undated Disability Report - Adult, Claimant reported being unable to lift anything heavier than a carton of milk and stopping work because of her disability. (Tr. 204-12). In the undated Disability Report - Appeal, she reported being unable to work because of her severe back pain and severe depression. (Tr. 216-24). She has to lie down and elevate her left leg periodically. (Tr. 221). Claimant cooks easy meals taking no more than fifteen minutes to prepare. She spends time with her child reading and coloring and doing workbooks. During her bouts with depression, she does not visit friends or relatives. (Tr. 221).

In the Missouri Supplemental Questionnaire completed on October 19, 2009, she included as her activities playing board games, coloring, reading with her son, talking on the phone, visiting with friends, and watching movies/television. (Tr.237-44).

In the case analysis dated February 15, 2008, Ms. Otterson noted that the "[e]vidence in file reveals that hypertension has been diagnosed, and is treated with medications.... There is no evidence of end organ damage due to hypertension." (Tr. 269).

## III. Medical Records

On June 15, 2005, Claimant sought treatment in the emergency room at St. Joseph Hospital West for sudden onset of symptoms of lower back pain and injury. (Tr. 416-20). Examination showed paraspinal tenderness. (Tr. 416). The doctor diagnosed her with acute lumbar strain and prescribed Flexeril and Percocet. (Tr. 417). The doctor noted how she is able to ambulate normally. (Tr. 417).

Dr. Stanley Martin treated Claimant on June 28, 2005 at the request of Dr. Hoffman for LLE pain. (Tr. 274). The neurologic examination showed her to be alert and full oriented and normal memory and attention span. Dr. Martin noted her gait to be normal and she is able to walk on heels, toes and in tandem without difficulty. (Tr. 274). The June 16, 2005, MRI showed a left L5-S1 disc herniation with an inferiorly migrated fragment, and mild degenerative changes at L4-5 and at T12-L1. (Tr. 275). Dr. Martin found she has syndrome consistent with a left S1 radiculopathy, and her symptoms are related to the disc abnormality at L5-S1. Dr. Martin recommended doing a left L5-S1 micro discectomy and offered to perform the procedure the next day, but Claimant declined wishing to wait a week until after the closing on her house. Dr. Martin noted how she is willing to accept the risk of permanent weakness or chronic pain due to the delay. (Tr. 275). On July 5, 2005, Dr. Martin performed a left L5-S1 micro-surgical discectomy. (Tr. 272-73). In follow-up treatment on July 13, Dr. Martin found her to be doing satisfactorily, and her symptoms to be consistent with inflammation of the nerve root postoperatively and prescribed Motrin 800 mg. (Tr. 271). She reported marked improvement in her LLE pain on July 28. (Tr. 270). Examination showed good strength in both lower extremities and able to walk on her heels and toes. Dr. Martin released her to part-time work as a prn nurse but limited her lifting to no more than thirty pounds and ordered physical therapy twice a week for two weeks. Dr. Martin noted she did not have to return routinely but only for further problems. (Tr. 270).

On February 1, 2006, Dr. Saaid Khjasteh noted she has a problem with narcotics. (Tr. 390-94).

On February 12, 2006, Claimant presented at the emergency room at Lincoln County

Medical Center complaining of lumbar back pain starting after she lifted her thirty-five pound child a couple of days earlier.  (Tr. 563- 74).

In the February 15, 2006 assessment, Elizabeth Brown, a social worker at Alternative Behavior Center, Claimant reported stress in her marriage, and her spouse lives in the basement. (Tr. 379-80).  Listed in the substance abuse history is narcotics, and job related problems as a result of addiction.  (Tr. 380).  In the assessment, Ms. Brown noted Claimant "is addressing addiction to prescription medication" and experiencing marital stress."  (Tr. 383).  In the Substance Abuse History, she reported using narcotics frequently.  (Tr. 1391).  In the Mental Health/Psychiatric Treatment History, Claimant reported she had none.  (Tr. 1392).  In the assessment, the Ms. Brown noted how she is addressing addiction to prescription medication and experiencing marital stress causing depressed feelings.  (Tr. 1394).  In the treatment plan, it is noted Claimant has employment problems and license issues due to stealing drugs.  (Tr. 14223). In the February 15, 2006 Treatment Plan Review, the following is noted as goals and plans: "... admitted narcotic dependancy to administration.  Plan to see EAP officer today (and) file necessary paperwork with Mo. State Board of Nursing."  (Tr. 1426).  In the plan, Dr. Khjasteh noted she would need a new job without narcotics access.  (Tr. 1426).

In the February 22, 2006 treatment note, Dr. Saaid Khjasteh listed her chemical dependency to be narcotics, and she reported telling the hospital about her use.  (Tr. 1387).

In the March 24, 2006 Discharge Summary, a case manager at Alternative Behavioral Care noted how Claimant had been treated for abusing narcotics, and she should increase her exercise regimen to four times a week.  (Tr. 1379-80).  She admitted to abusing prescription drugs , her drug of choice being Dilaudid, while at work and getting the prescription drugs from

work.  (Tr. 1381, 1383).

On May 26, 2006, Claimant returned to Dr. Martin complaining of low back pain.  (Tr. 268).  She reported doing well postoperatively and having good improvement until she experienced severe low back pain after playing volleyball.  She first sought treatment in the emergency room and received prescriptions for Vicodin, Flexeril, and Naprosyn, but she has run out of the medications.  Examination showed no tenderness of her lumbar spine and moderate bilateral paralumbar muscular spasm to palpation.  (Tr. 268).  Dr. Martin diagnosed her with acute lumbar soft tissue injury.  (Tr. 269).  Dr. Martin prescribed Percocet at her request, and he prescribed Valium.  (Tr. 269).  In follow-up on June 13, she reported continued low back pain and little relief from the medications.  (Tr. 267).  Examination showed no costovertebral tenderness, and good strength in all of her extremities.  Dr. Martin found her symptoms best fit with a lumbar soft tissue injury, and he arranged for physical therapy treatment three times a week for two weeks and prescribed Percocet.  (Tr. 267).

On June 15, 2007, Claimant returned and reported doing well until about a month earlier "when again, after no trauma or clear inciting event, she re-developed low back pain."  (Tr. 265).  She reported being off work for several months but not due to the low back pain.  Examination showed no tenderness of her lumbar spine and no costovertebral angle tenderness.  (Tr. 265).  Dr. Martin observed her gait to be normal and found her to have good strength in all four extremities without focal weakness.  (Tr. 266).  The May 24 MRI showed mild degenerative changes at L4-5.  Dr. Martin found her syndrome to be consistent with a lumbar soft tissue injury.  She asked for a Percocet refill, and he provided a refill of 60 tablets on a prn basis and asked her to return in three to four weeks if she is not improving.  (Tr. 266).

On July 16, 2007, Claimant sought treatment from Dr. Kristin Phillbrick for low back pain and requested pain medication so she could tolerate physical therapy. (Tr. 281). She reported being a stay at home mom, registered nurse. Dr. Phillbrick prescribed 40 tablets of Percocet. (Tr. 281). On July 26, she reported continued pain with physical therapy helping for a few hours. (Tr. 280). Examination showed no vertebral spine tenderness, normal motor strength, and normal gait. Dr. Phillbrick prescribed 60 tablets of Percocet and made a referral to St. Peters' bone and joint. (Tr. 280).

On September 11, 2007, Dr. Robert Backer noted how Claimant sought treatment for chronic disabling back pain developing in the last year. (Tr. 278, 353-55). Dr. Backer found her examination showed no signs for radiculopathy, and the MRI showed degenerative changes at L5/S1, and he recommended a lumbar diskogram. (Tr. 278, 353-55).

From September 19, 2007 through March 11, 2008, Claimant received treatment at Pain Management Services at Western Anesthesiology Associates on referral by Dr. Backer on ten dates for low back pain. (Tr. 318-49). During the initial treatment on September 19, she reported being currently unemployed and denied having used narcotics or undergoing drug or alcohol rehabilitation or having abused prescription drugs. (Tr. 321-22). Examination showed limited range of motion of the lumbar spine with flexion and extension and lower extremity strength of 5/5. (Tr. 323). Dr. Brian Smith observed Claimant to have a normal gait and noted she did not appear to be depressed and have any undue anxiety. (Tr. 324). In the assessment, Dr. Smith included degenerative disc disease and lumbar disc protrusions, at L4-5 and L5-S1. He had Claimant execute a narcotic contract and discontinued Oxycontin and prescribed Opana. (Tr. 324). On September 21, Dr. Smith performed a lumbar selective epidural steroid injection and

discontinued Opana due to her vomiting with Opana and prescribed Oxycotin. (Tr. 318-19). Claimant reported her pain as unchanged and no significant improvement from injection on October 9. (Tr. 326). She underwent diagnostic lumbar discograms. (Tr. 326). The lumbar discogram showed sensitive disc at L4-5 and L5-S1 with an essentially normal appearing control disc at L3-4. (Tr. 327-28).

On November 9, 2007, Claimant sought treatment in the emergency room at St. Joseph Hospital West for lower back pain. (Tr. 402- 408). Examination showed no tenderness to palpitation to her back and mild pain with movement. (Tr. 402). She presented again the next day and reported worsening pain and abdominal discomfort. (Tr. 469-559). Dr. Ranes found she had intractable back pain "secondary to the fact that she has not been able to tolerate her home doses of OxyContin. She is currently stable on patient-controlled analgesia. (Tr. 472). The CT scan of her abdomen showed normal abdomen. (Tr. 502).

On November 13, 2007, Claimant reported going to the emergency room for pain and receiving Dilaudid since her last visit on October 9. (Tr. 334). While in the emergency room, she was treated with an IV PCA of Hydromorphone. (Tr. 334). Dr. Smith found she has degenerative disc disease with discogenic pain involving L4-5 and L5-S1 discs with positive discograms at these levels. (Tr. 335). Dr. Smith noted that inasmuch as she has tolerated Hydromorphone better than any other narcotic, he continued Hydromorphone for pain. He also provided samples and a prescription for Cymbalta for depression and noted it may provide some additional pain relief. (Tr. 335). She returned on December 4 for mediation refills. (Tr. 336). She reported running out of Oxycontin early because of vomiting. (Tr. 337). On December 18, she called the office complaining of increased low back pain. (Tr. 340). She admitted tolerance

to the pain medication may be an issue. (Tr. 340). Dr. Smith increased her Oxycontin dosage. (Tr. 341).

On December 4, 2007, Claimant sought treatment in the emergency room at St. Joseph Hospital West for nausea and vomiting and reported recently switching from dilaudid to oxycontin. (Tr. 409-14). She reported being out of her oxycontin medication, but the emergency room doctor would not provide an oxycontin prescription but gave her a few percocet for relief until she can follow up with Dr. Smith. (Tr. 410). After iv infusing, she reported feeling better. (Tr. 414).

In follow-up treatment on January 2, 2008, Dr. Smith continued her medication regimen. (Tr. 342-43). On January 9, 2008, Dr. Smith noted since seeing Claimant last, she sought treatment in the emergency room at St. Johns Mercy Medical Center for severe intrathecal back pain, and Dr. Backer recommended performing a two level anterior fusion, and Dr. Page increased her Oxycontin dosage to 160 mg. (Tr. 344). She noted some improvement of her pain. (Tr. 344). Dr. Smith observed she appeared to be less depressed and less anxious compared to her last office visit. (Tr. 345).

On January 3, 2008, Claimant was admitted through the emergency room for pain control and reported disabling back pain even though she has been in pain management and tried epidural steroids. (Tr. 301, 303). Examination showed lumbar spine to be nontender to palpation and significant lumbar paraspinous muscle tenderness throughout the entire lumbar region. (Tr. 305). She reported being a stay-at-home mom and previously working as a registered nurse. (Tr. 305). Dr. Backer increased he Cymbalta dosage as she reported added stress to her life, because her husband is considering a divorce. (Tr. 306). Dr. Backer noted that she is currently taking high,

large doses of narcotics, 80 mg of Oxycontin three times a day and 50 mg of Percocet twice a day. (Tr. 301). She had two incidental falls in the past days, one slipping in some mud. Examination showed motor strength of 5/5. (Tr. 301). August MRI showed degenerative change at L5-S1 with modic changes in the vertebral bodies of L5-S1, and Dr. Backer found she has chronic disabling pain with degenerating disks. (Tr. 302).

On January 16, 2008, Dr. Backer performed a 2 level anterior lumbar interbody fusion at L4-L5, L5-S1 for her chronic disabling low back pain. (Tr. 284-86). She reported Oxycontin and Valium as her medications. (Tr. 286). Degenerative disk with disabling low back pain L4-5, L5-S1 is listed as postoperative diagnosis. (Tr. 293). The January 31, 2008, radiology report showed stable anterior fusions at L4-L5 and L5-S1. (Tr. 283). Dr. Backer discussed with her how he would not give her narcotics longer than three months postoperatively. (Tr. 364-65).

On January 31, 2008, Claimant returned to Dr. Backer's office for treatment. (Tr. 356). The image of her lumbar spine showed stable anterior fusions. (Tr. 360).

On February 27, 2008, Claimant reported some partial improvement with her pain status post an anterior lumbar fusion. (Tr. 346). She is taking 120 mg of Oxycontin twice a day and questioning if Cymbalta has been beneficial as treatment for her depression. (Tr. 346). Dr. Smith discontinued Cymbalta and prescribed Paxil. (Tr. 347).

On March 6, 2008, Dr. Backer refilled her Oxycontin during an office visit. (Tr. 358).

On March 11, 2008, Claimant reported doing reasonably well after anterior fusion but then developing severe intractable left lower extremity pain. (Tr. 348). Dr. Smith observed she appears to be in significant pain ambulates with a left side limp. (Tr. 348-49). Dr. Smith performed a lumbar selective nerve root steroid injection and noted her depression to be

somewhat improved on Paxil.  (Tr. 349).  She reported taking significantly larger amounts of Oxycontin due to her severe pain and her insurance will not allow her to have any more Oxycontin until the prescription is due.  As a consequence, Dr. Smith opined that she is not going to be able to abruptly stop such large doses of narcotics, he prescribed MS Contin to take in place.  (Tr. 349).

The March 26, 2008 MRI showed mild central canal narrowing unchanged at L4-L5 without evidence of significant disc bulging, and interval surgery with anteriorly located hardware L4-L5 and L5-S1.  (Tr. 361-62).

In the March 28, 2008 letter to Dr. Smith, Dr. Backer noted having a follow-up MRI showing post operative changes and talking to Claimant who sounded quite well.  (Tr. 365).  She would follow-up with him on an as needed basis.  (Tr. 365).

On May 9, 2008, Claimant sought treatment in the emergency room at St. Joseph Hospital West for nausea and vomiting and unable to keep food down for two to three days and unable to take regular dose of oxycodone.  (Tr. 427-68).  Dr. Kristin Phillbrick noted given her tolerance to opioids, her current doses of dilaudid are not adequate to manage pain.  (Tr. 429).

On June 22, 2008, Claimant received treatment in the emergency room at Lincoln County Medical Center after an intentional overdose.  (Tr. 584-647).  A nurse observed Claimant to have an even, steady gait with no difficulties in ambulating noted.  (Tr. 592).  The attending physician, Dr. Joy Stowell noted the exact timing of when the overdose occurred to be questionable.  (Tr. 597).  She complained how her back pain causes her to lie down most of the time and prevents her from playing with her son.  She reported not being able to work for the last two years.  (Tr. 597).  Dr. Stowell admitted her to ICU for observation and noted suicide attempt with

polysubstance. (Tr. 598). Dr. Stowell had Claimant transferred to CenterPointe Hospital for psychiatric care. (Tr. 645, 1080).

On June 23, 2008, Claimant was transferred to CenterPointe Hospital for psychiatric stabilization after being hospitalized for voicing suicidal thoughts with an attempt by overdosing. (Tr. 1080-1146). At the time of discharge, she noted how she is planning on divorcing her husband, going on disability, and living with her mother. (Tr. 1080). The treating doctor noted how she has tried different antidepressants by her pain doctor, but she has not sought treatment by an outpatient psychiatrist. (Tr. 1085). The doctor admitted her for safety monitoring and therapeutic milieu. (Tr. 1087). She noted she preferred Wellbutrin and hoped this would help her with smoking cessation. (Tr. 1087).

On July 8, 2008, Claimant was transferred to CenterPointe Hospital from the inpatient psychiatric unit after treatment for signs of depression with a suicide attempt and an overdose on pills. (Tr. 1062-1079). She reported being separated from her husband, her child is living with her parents, she is taking heavy addictive medications, and she is unable to work because of the pain. (Tr. 1062). The Final Diagnoses in the Discharge Summary date July 16, 2008 lists major depressive disorder without psychosis and rule out bipolar affective disorder, chronic pain, and unemployed. (Tr. 1063).

On July 21, 2008, Claimant sought treatment at CenterPointe Hospital for increased depression after being served her divorce papers the day prior to admission. (Tr. 969-1062). She feared of taking an overdose and felt like she needed treatment at the hospital. (Tr. 969). She reported emotional abuse for the last three to five years. (Tr. 970). Occupational problems is listed in the discharge diagnoses. (Tr. 970). She reported being on disability due to back pain.

(Tr. 972). Divorce process, relationship and unable to work are listed in the admission diagnoses. (Tr. 972).

On August 22, 2008, Claimant sought treatment at CenterPointe Hospital for worsening depression and was admitted for treatment for six days. (Tr. 901-68). She is going through a divorce and just learned her estranged husband is being transferred to Alabama. (Tr. 901, 906). She reported being on disability due to back pain. (Tr. 906). The doctor observed she had normal posture and gait, and noted she is preoccupied with the impending losses and stressors. (Tr. 907). Mental status examination showed her concentration to be intact as evidenced by her ability to follow three step directions, and her insight and judgment to be fair as evidenced by her understanding of need for treatment. (Tr. 907).

On September 2, 2008, Claimant was admitted to CenterPointe Hospital's Acute IOP Program after stepping down from CenterPointe Hospital after being treated for a suicide attempt. (Tr. 876-900). Her depression had increased over the last six months due to marital discord and loss of her child from a custody dispute. (Tr. 876).

On October 22,2008, Claimant sought treatment at CenterPointe Hospital for increased depression, lack of motivation, and suicidal ideation and was admitted for five days. (Tr. 818-75). She reported going through a bad divorce and battling for custody of her son. (Tr. 818). The following notation is made in the social history:

> Social and Background History: She is currently staying with her parents. She is separated. She has a five-year-old son. She has a RN degree. She is a Registered Nurse, but has not been working for the past many years. Currently, she is unemployed, retired, legal problems, battling son's custody, and going through divorce.

(Tr. 825). She was admitted to psychiatric inpatient unit for assessment, stabilization, and

medication adjustment.  (Tr. 826).

On November 13, 2008, Claimant sought treatment at CenterPointe Hospital.  (Tr. 673-759).  She reported her medications not working and her symptoms worsening.  (Tr. 673).  She is having suicidal ideation with thoughts to overdose on medication.  Her stressors include going through a divorce and chronic back pain.  "The patient also feels that she does not want to work anymore."  (Tr. 673).  She has been diagnosed with bipolar disorder and has had at least four inpatient psychiatric admissions in the past two years.  (Tr. 673).  She reported undergoing a nasty divorce, battling over custody, and currently not working.  (Tr. 679, 681).  She smokes a package of cigarettes each day.  (Tr. 673).

At the time of discharge on November 20, Dr. Malik found her mood to be stabilized and her anxiety and depression to be decreased.  (Tr. 673). She reported no side effects from medications including OxyContin, Seroquel, Topamax, Wellbutrin, Ambien, Colace, Prozac, Geodon, and Motrin,  (Tr. 673-74).  Bipolar affective disorder mixed and history of substance abuse and problems with primary support group are listed in the discharge diagnoses.  (Tr. 674).

On December 10, 2008, Claimant sought treatment at CenterPointe Hospital after having hallucinations for six days and was admitted for treatment for six days.  (Tr. 751-817).  She has a history of bipolar affective disorder and polysubstance dependency.  (Tr. 751).  Her major stressor is she is currently going through a divorce, a custody hearing, and economic problems.  (Tr. 751-52, 763).  She reported being a registered nurse but currently not working.  (Tr. 754).

On December 22, 2008, Dr. Philip Dean treated Claimant and prescribed Oxycontin for prn use for back pain breakthroughs.  (Tr. 1267).  On December 29, she reported disturbed nocturnal sleep leading to daytime drowsiness.  (Tr. 1278).  She reported having fun over

Christmas.  (Tr. 1279).

From October 27, 2008 through February 16, 2009, Jennifer Hammond, a therapist, saw Claimant five times.  (Tr. 1148-52).  In the psychological evaluation, she reported divorce and custody as her psychosocial stressors.  (Tr. 1150).  In follow-up treatment on November 4, she reported going shopping with her son.  (Tr. 1149).  On January 3, 2009, she reported totaling her car and ended up in the hospital and being worried about having money for her attorney bills.  (Tr. 1148).  She has been spending time with her son and even had dinner with her husband for her son's sake.  On February 16, she reported problems sleeping and going to family events and doing stuff. (Tr. 1148).

On January 22, 2009, Dr. Dean examined Claimant.  (Tr. 1285).  Dr. Dean lowered her Seroquel dose and observed she seems fairly stable.  (Tr. 1288).  She reported verbal counseling helps.  (Tr. 1288).

In the February 19, 2009 treatment note, Dr. Dean found her moods and back pain to be improving.  (Tr. 1216).  She reported doing better on current medications without any side effects.  (Tr. 1217).  On March 19, Dr. Dean noted how she is doing better, and she should follow up with Dr. Malik.  (Tr. 1228).  On April 6, Claimant reported taking care of her son and exercising together.  (Tr. 1236).  She complained of neck pain consistent with cervical radicular pain, and Dr. Dean noted she needs to have a MRI for evaluation.  She reported filing disability papers on that day and slipping and falling the day before.  (Tr. 1237, 1879).  Although her depression was bad last year, Claimant reported being much improved on medications.  (Tr. 1237).  In follow-up treatment on April 20, she reported experiencing headaches and doing better on current medication regimen without any side effects.  (Tr. 1248).

On May 14, 2009, Dr. Scott Roos treated Claimant for elevated blood pressure and lumbar disc degeneration. (Tr. 1309). Examination showed no skeletal tenderness or joint deformity. (Tr. 1312). Neurological examination showed Claimant to be alert and oriented. She was oriented to time, place, person, and situation, and her affect was normal. Dr. Roos noted she had normal insight and exhibits normal judgment. (Tr. 1312).

In the May 18, 2009 letter to Dr. Malik, Dr. Dean provided a medical status update. (Tr. 1257).

On June 15, 2009, Dr. Philip Dean treated Claimant for anxiety and elevated blood pressure. (Tr. 1161). She reported being a nonsmoker and exercising. (Tr. 1161). Dr. Dean noted how no narcotic prescriptions would be refilled over the phone, and how any "lost prescriptions" would require a new appointment. (Tr. 1162). Dr. Dean noted he could see her without insurance if need be with many free samples or low cost programs from drug companies. (Tr. 1163). He observed her gait to be normal and found her to be oriented to place and time and person. (Tr. 1163). She complained of back pain due to disc disease. (Tr. 1164). Dr. Dean noted how she had several psych admissions in 2008, but she is now very stable except for insomnia since off of Seroquel. She reported not being able to see Dr. Malik lately because he is out of town a lot. (Tr. 1164).

In a June 23, 2009 letter directed to Dr. Dean, Clinical Services at CVS Caremark noted concern about Claimant's medication regimen and urges changes to be made. (Tr. 1167). In the Prescriber Response Form, Dr. Dean noted "You are 'preaching to the choir.' I m getting her off of polypharmcy. Direct your concern to her other doctors! I already know!" (Tr. 1168). In follow-up treatment on August 3, Dr. Dean lowered her Seroquel dose, and noted she seemed

stable. She reported verbal counseling helping. (Tr. 1177-78). Dr. Dean counseled her to stop smoking. (Tr. 1181).

In the August 31, 2009 letter to Dr. Malik, Dr. Dean noted how Claimant was doing well after her stressful divorce and had little in a way of depressed moods. (Tr. 1192). Dr. Dean noted her back pain due to disc disease may slowly respond to medicines and/or physical therapy. Examination showed normal motor and sensory function and a normal gait, (Tr. 1192). On September 28, Dr. Dean treated Claimant and adjusted her medication regimen. (Tr. 1207).

On October 26, 2009, Dr. Dean noted her back pain due to disc disease may slowly respond to medications and/or physical therapy. (Tr. 1493). She expressed concern about health insurance, and Dr. Dean explained he could still see her without insurance if need be with many free samples or low cost programs from drug companies. (Tr. 1494). Dr. Dean noted her bipolar to be "very stable except for insomnia since off Seroquel." (Tr. 1493).

In the November 19, 2009 treatment note, Claimant reported vomiting for the last twelve hours after eating a bad steak. (Tr. 1821). On December 14, Dr. Dean treated Claimant for bipolar and back pain. (Tr. 1814). She reported doing very well. (Tr. 1816).

In the January 11, 2010 treatment note, Dr. Dean noted Claimant to be medicine noncompliant. (Tr. 1787-99). She admitted how she was "doing not bad," because the medications help with her chronic back pain. (Tr. 1800). She fell on the ice two weeks earlier. (Tr. 1800). On January 28, Claimant reported her mood to be better despite he Beck Depression Inventory score. (Tr. 1791). She reported although her depression was really bad last year, the depression has much improved on medications. (Tr. 1791). After falling on the concrete driveway, she experienced throbbing pain. (Tr. 1793). In the February 8,treatment note, she

reported having "little in way of depressed moods for many days at a time. No crying spells."
(Tr. 1786). Dr Dean observed her gait to be normal. Dr. Dean found her back pain may slowly respond to medicines and/or physical therapy. (Tr. 1786).

In the February 22, 2010 letter addressed to Claimant's counsel, Dr. Dean opined as follows:

> I am responding to your request for a report in connection with Rebecca A. Pickle's Social Security Appeal. I have treated Becky from December 22, 2008 to the present date for failed back syndrome. In my opinion, Becky is disabled and unable to engage in any substantial gainful employment and has been unable to do so since her most recent back surgery in January, 2008. She underwent two back surgeries, the first being a laminectomy at L5-S1 performed by Dr. Stanley Martin in July 2005, and then a fusion at L4-5 and L5-S1 in January, 2008 by Dr. Robert Backer.

> Due to chronic pain, Becky cannot sit nor stand for more than 30 minutes at a time. I have observed her when she was not aware I was doing so. There is no "mismatch" of her exam room behavior versus her parking lot gait. She cannot lift more than 10 to 15 pounds....

> In my opinion, Becky does not exhibit any drug-seeking behavior. She has requested that I lower or minimize her prescription medications faster than I felt comfortable with. At times, we have lowered her medications too quickly and she had panic attacks and insomnia and had to go back up slowly on the psychiatric medication, not on her opioids. She had anxiety disorder and depressive disorder prior to her back surgeries. She became suicidal after her divorce proceedings began in 2008 and was hospitalized several times at Centerpoint Hospital with Dr. Afzar Malik....

> ***

> Becky has bipolar disorder and depression and will need medication for this condition for the rest of her life. She had four in-patient hospitalizations in the two years prior to 2008, according to Dr. Malik's records.

> Due to her lumbar disc removal and fusions at two levels, with decreased range of motion of her back, she cannot easily bend over or carry heavy objects. It is possible she could perform some type of home-based work at a desk with flexible hours.

- 23 -

(Tr. 1481-82).

On March 4, 2010, Dr. Dean prescribed choloral hydrate for sleep insomnia. (Tr. 1782). She reported doing much better after starting Zantac one month earlier. (Tr. 1784). She reported wanting to do duties of cooking. (Tr. 1784). In a follow-up visit on March 25, Claimant reported not having depressed moods for many days at a time and no crying spells. (Tr. 1777). Dr. Dean noted her cerebellar and gait to be normal. (Tr. 1777). Dr. Dean noted how she has taken herself off many medications and encouraged her to be compliant in the future. (Tr. 1780). On April 8, she reported falling down the basement stairs while carrying a food tray. (Tr. 1173-74). On May 3, Claimant reported her bipolar to be very stable except she is experiencing insomnia since off Seroquel. (Tr. 1767). She noted the verbal counseling at CenterPointe Hospital. (Tr. 1768). In the May 27 treatment note, Dr. Dean noted her Beck Depression Inventory score seemed somewhat high and lowered her Seroquel dose. (Tr. 1761-63).

In the June 24, 2010 treatment note, Claimant reported medications provide relief for her chronic back pain and having problems sleeping. (Tr.1890). Her mood is not bad considering her marital relationship problems, and her son is moving to Kentucky because her former husband has primary custody. (Tr. 1890). On July 29, Claimant reported not feeling motivated and having difficulty sleeping. (Tr. 1885). Her back pain is causing problems with her activities of daily living. (Tr. 1885). In the office visit on August 12, Claimant reported not sleeping and not taking her blood pressure medication. (Tr. 1880). She has pain in her back, and has to go to Kentucky to visit her son, because her estranged husband took him to Louisville. (Tr. 1880).

The September 14, 2010 radiology report of her lumbar spine identified no acute abnormalities. (Tr. 1609, 1716).

In the September 9, 2010 treatment note, Claimant reported mid back pain interfering with her daily activities. (Tr. 1872). On September 27, she reported driving her vehicle off the shoulder into the culvert when she looked down to pick up her phone. (Tr. 1867). Her head hit the windshield in the accident and the air bag deployed, but she did not lose consciousness. She has lower back pain Claimant concerned she might have a concussion, because she has blurred vision and dizziness. (Tr. 1867). In follow-up treatment on October 25, she reported having a motor vehicle accident on September 22 and having moderate back pain. (Tr. 1861).

The October 28, 2010 MRI of her lumbar spine showed status post anterior spinal fusion at L4-L5 and L5-S1 with stable hardware, no large disc herniation, canal stenosis, minimal annular bulge at L3-4, mild facet osteoarthritis at L4-5, and no abnormal enhancement. (Tr. 1722).

In the December 2 treatment note, Dr. Dean found her blood pressure to be high. (Tr. 1856). She had a motor vehicle accident on November 26, and reported her back pain persists. (Tr. 1857).

On January 3, 2011, Claimant reported having back pain and no bowel movement for two weeks. (Tr. 1851). In the February 4 treatment note, Dr. Dean found her blood pressure to be high. (Tr. 1845). On February 24, Claimant reported having migraine headaches and shortness of breath. (Tr. 1841).

During treatment in the emergency room on March 5, 2011, the musculoskeletal examination showed a full range of motion of all four extremities. (Tr. 1618).

In the March 17, 2011 treatment note, Claimant reported smoking, and her boyfriend will never steal medications again. (Tr. 1885). On March 28, Dr. Dean refilled her Oxycontin and

Seroquel prescriptions. (Tr. 1881). In the April 25 treatment note, Claimant reported having severe stomach pains and vomiting. (Tr. 1825).

On April 15, 2011, Claimant sought treatment in the emergency room for diffuse abdominal cramping. Examination showed a normal range of motion along her entire spine and non-tender. (Tr. 1637).

On April 18, 2011, Dr. Scott Roos treated Claimant for hypertension, abdominal discomfort, and anxiety/depression. (Tr. 1662). Examination showed no motor weaknesses and her balance and gait intact. (Tr. 1664-65). In the assessment, Dr. Roos noted her degenerative disc to be chronic and stable. (Tr. 1668).

On May 26, 2011, Claimant reported having moderate back discomfort and improved moods on Seroquel. (Tr. 1954). In the June 23 treatment note, Claimant reported tension with her parents, because she is dating her boyfriend again after an earlier break up. (Tr. 1946). Her son was supposed to spend the summer with her, but he returned to his father. On July 21, Claimant complained of back pain, and Dr. Dean refilled her Oxycontin prescription. (Tr. 1936). In the August 18 treatment note, Dr. Dean noted the last time Claimant saw Dr. Malik was in the hospital. (Tr. 1932). She indicated that she could not work without pain medications, and the $250 a month income makes it impossible to afford medications. (Tr. 1933).

In the October 13, 2011 treatment note, Dr. Dean nothing helping her headaches. (Tr. 1919). On October 21, Claimant reported having severe headaches. (Tr. 1909).

IV.     **The ALJ's Decision**

The ALJ found that Claimant met the insured status requirements of the Social Security Act on November 2, 2007, and she remained insured throughout the period of the decision. (Tr.

17).  Claimant has not engaged in substantial gainful activity since November 2, 2007.  The ALJ found that the medical evidence establishes that Claimant has the impairments of degenerative lumbar disc disease and a bipolar disorder (the sleep disorder is considered a symptom of the bipolar disorder).  (Tr. 17).  The ALJ found that Claimant's condition has not met or medically equaled a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 18).  The ALJ found that since November 2, 2007, Claimant has had the residual functional capacity to perform a limited range of unskilled light work, except she can only stoop, crouch, and crawl on an occasional basis; has to avoid climbing of ladders, ropes, and scaffolds; and has to avoid hazardous heights.  The ALJ further noted she is able to understand, remember and carry out at least simple instructions and non-detailed tasks.  (Tr. 18).

The ALJ found Claimant unable to perform her past relevant work and does not have any transferrable skills.  (Tr. 20).  Claimant is a younger individual with more than a high school education and is able to communicate in English.  (Tr. 20).  Next, the ALJ found considering her age, education, work experience, and residual functional capacity, there are a significant number of jobs in the local and national economies she could perform including an order caller and a mail clerk.  (Tr. 20-21).

V.    Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age,

education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-42 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.     The credibility findings made by the ALJ.

2.     The claimant's vocational factors.

3.     The medical evidence from treating and consulting physicians.

4.     The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.     Any corroboration by third parties of the claimant's impairments.

6.     The testimony of vocational experts when required which

is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

     The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese , 552 F.3d at 730 (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008).

"Substantial evidence is less than a preponderance but is enough that a reasonable mind would

find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v.

Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether

the Commissioner's decision is supported by substantial evidence, however, the Court must

consider evidence that supports the decision and evidence that fairly detracts from that decision.

Id. The Court may not reverse that decision merely because substantial evidence would also

support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it

might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to

draw two inconsistent positions from the evidence and one of those positions represents the

agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d

891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the

ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the

available zone of choice") (internal quotations omitted).

     Claimant contends that the ALJ's decision is not supported by substantial evidence on the

record as a whole, because the ALJ's RFC does not include limitations resulting from her bipolar

disorder. Claimant also contends that the ALJ failed to accord appropriate weight to her treating physician.

A.    <u>Weight Given to Treating Doctor</u>

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record inasmuch as the ALJ failed to give the treating source's opinion proper weight.

The undersigned finds that the ALJ considered Dr. Dean's opinion and gave sleight weight to his opinion in her written opinion as follows:

> In February 2010, Dr. Dean opined that the claimant's lumbar condition had precluded her from engaging in any substantial gainful employment since January 2008.... This opinion is given slight weight because it is grossly inconsistent with th exam results he obtained, namely, normal motor function, normal reflexes, an absent Romberg's test, an absent Gower's sign, a normal gait, and normal sensory function except at the C6-7 dermatone.... It is also internally inconsistent: despite having sais she could not perform any substantial gainful employment, he stated that she could lift up to fifteen pounds and sit as well as stand thirty minutes at a time; he further stated that she may be able to perform "home-based work at a desk with flexible hours." The opinion is also inconsistent with other evidence of record (see below as well as above).

(Tr. 19) (internal citations omitted).

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" <u>Tilley v. Astrue</u>, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. §404.1527(d)(2) (alteration in original). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." <u>Wagner v. Astrue</u>, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical

evidence contained within the record.'" Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000)).

A treating physician's opinion may be, but is not automatically, entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2). Controlling weight may not be given unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. SSR 96-2P, 1996 WL 374188 (July 2, 1996). Even a well-supported medical opinion will not be given controlling weight if it is inconsistent with other substantial evidence in the record. Id. "The record must be evaluated as a whole to determine whether the treating physician's opinion should control." Tilley, 580 F.3d at 679. When a treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010( (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). "A treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Perkins v. Astrue, 2011 WL 3477199, *2 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009)). The ALJ is charged with the responsibility of resolving conflicts among the medical opinions. Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008).

Additionally, Social Security Ruling 96-2p states in its "Explanation of Terms" that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, at *2 (S.S.A. July 2, 1996). SSR 96-2 clarifies that 20 C.F.R. §§ 404.1527 and 416.927 require the ALJ to provide "good reasons in the notice of the determination or decision for the weight given

to a treating source's medical opinion(s)."  Id. at *5.

The ALJ found Dr. Dean's opinion set forth in the February 22, 2010 letter opining that her lumbar condition had precluded her from engaging in any substantial employment since January 2008 to be inconsistent with his own exam results and treatment notes.  The undersigned finds no such limitations or findings precluding engaging in employment are found in any of his treatment notes.  "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."  Davidson v. Astrue, 578 F.3d 838, 843 (8th Cir. 2009), or when it consists of conclusory statements, Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010).  See also Clevenger v. S.S.A., 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements.").  Dr. Dean's opinions are not supported by his treatment notes and are conclusory.  See McCoy v. Astrue, 648 F.3d 605, 617 (8th Cir. 2011) (rejecting claimant's challenge to lack of weight given treating physician's evaluation of claimant's mental impairments when "evaluation appeared to be based, at least in part, on [claimant's] self-reported symptoms, and, thus, insofar as those reported symptoms were found to be less than credible, [the treating physician's] report was rendered less credible.").  In the February 8, 2010 treatment note,  Dr Dean observed her gait to be normal.  Dr. Dean found her back pain may slowly respond to medicines and/or physical therapy.

First, to the extent Dr. Dean opined that Claimant is disabled, a treating physician's opinion that a claimant is not able to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling

weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).  The ALJ acknowledged that Dr.

Dean was a treating source, but that his opinion was not entitled to controlling weight because it

is internally inconsistent and inconsistent with the objective medical evidence in the record.  See

Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent

with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.").  As

noted by the ALJ, Dr. Dean's opinion is internally inconsistent inasmuch as he opines she cannot

perform any substantial gainful employment but then concludes by opining she may be able to

perform home-based work at a desk with flexible hours.

 The ALJ acknowledged that Dr. Dean was a treating source, but that his opinion was not

entitled to controlling weight, because it was not well-supported by medically acceptable clinical

and laboratory techniques.  The undersigned notes no examination notes accompanied the

February 22, 2010 letter.  Opinions of treating doctors are not conclusive in determining disability

status and must be supported by medically acceptable clinical or diagnostic data.  Chamberlain v.

Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); 20 C.F.R. § 404.1527(d)(3) (providing that more

weight will be given to an opinion when a medical source presents relevant evidence, such as

medical signs, in support of his or her opinion).

 Second, Dr. Dean's opinion is inconsistent with his treatment notes.  Davidson v. Astrue,

578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a

treating physician that is inconsistent with the physician's clinical treatment notes.").  An ALJ may

"discount or even disregard the opinion of a treating physician ... where a treating physician

renders inconsistent opinions that undermine the credibility of such opinions."  Prosch v. Apfel,

201 F.3d 1010, 1013 (8th Cir. 2000); Hackler v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006)

(holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). The ALJ properly accorded Dr. Dean's limitations in the letter little weight inasmuch as his findings were inconsistent with, and unsupported by, the evidence of record. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.") (citation and internal quotation omitted). A review of his treatment notes shows he never imposed any functional limitations on Claimant.

As noted by the ALJ, the objective medical evidence showed post-operative medical images of her lumbar spine showed unremarkable results except for some sclerosis in the lower lumbar region and possible edematous change. The most recent imaging of her lumbar spine, the October 28, 2010 MRI, showed status post anterior spinal fusion at L4-L5 and L5-S1 with stable hardware, no large disc herniation, canal stenosis, minimal annular bulge at L3-4, mild facet osteoarthritis at L4-5, and no abnormal enhancement. Moreover, the musculoskeletal examinations showed essentially normal results for a lumbar standpoint and consistently showed she had normal motor, a normal gait, normal reflexes, and an absence of lumbar tenderness. On April 18, 2011, Dr. Roos' examination showed no motor weaknesses and her balance and gait intact. In the assessment, Dr. Roos noted her degenerative disc to be chronic and stable.

As noted by the ALJ, Claimant reported helping her young son with homework, playing board games, attending his school activities, and visiting with others. Likewise at the hearing, Claimant testified she is able to shop and able to stand for an hour at a time.

Further, no examining physician in any treatment notes stated that Claimant was disabled or unable to work or imposed mental limitations on Claimant's capacity for work. See Young v.

Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The absence of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012); Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). Thus, the ALJ did not err in giving slight weight to his findings. Renstrom, 680 F.3d at 1065 (ALJ properly gave treating physician's opinion non-controlling weight when that opinion was largely based on claimant's subjective complaints and was inconsistent with other medical experts). As such, the undersigned finds that the ALJ gave proper weight to Dr. Dean's opinion.

The undersigned finds that the ALJ's determination is supported by substantial evidence on the record as a whole. "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (citation omitted). "If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits." Id. (quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996)). Accordingly, the decision of the ALJ denying Claimant's claims for

benefits should be affirmed.

B.    Residual Functional Capacity

Claimant contends that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ's RFC does not include limitations resulting from her bipolar disorder.

A claimant's RFC is what he can do despite his limitations.  Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  The claimant has the burden to establish his RFC.  Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations.  Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Eichelberger, 390 F.3d at 591; 20 C.F.R. § 404.1545(a).  The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace.  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (internal quotation marks and citation omitted).  An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand.  Id.

The ALJ opined that Claimant since November 2, 2007, Claimant has had the residual functional capacity to perform a limited range of unskilled light work, except she can only stoop, crouch, and crawl on an occasional basis; has to avoid climbing of ladders, ropes, and scaffolds; and has to avoid hazardous heights.  The ALJ further noted she is able to understand, remember and carry out at least simple instructions and non-detailed tasks.  Next, the ALJ found considering her age, education, work experience, and residual functional capacity, there are a significant

number of jobs in the local and national economies she could perform including an order caller and a mail clerk.  (Tr. 20-21).

At the outset, the undersigned notes that the fact that Claimant did not allege any mental impairments in her application for disability benefits is significant, even though she submitted medical evidence of treatment for bipolar disorder starting more than seven months after her alleged onset date.  In her application for disability benefits, Claimant alleged disability due to degenerative disc disease of lumbar 4 and lumbar 5 vertebrae.  The ALJ found Claimant has the severe impairments of degenerative lumbar disc disease and a bipolar disorder with sleep disorder as a symptom and concluded that the impairments, alone or in combination, are not of listing level.  A review of Claimant's application shows that she failed to allege mental impairments as a basis for disability.  See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (failure to allege disabling mental impairment in application is significant, even if evidence of depression was later developed).  The undersigned concludes that the ALJ did not err in discounting Claimant's mental impairments.  See Kirby v. Astrue, 500 F.3d 705, 707-09 (8th Cir. 2007) (impairment is not severe if it is only slight abnormality that would not significantly limit mental ability to do basic work activities; claimant bears the burden of establishing impairment's severity).  The ALJ opined that Claimant at the hearing as follows:

> With respect to the claimant's mental condition, the medical record is silent from November 2, 2007 through June 21, 2008.  It shows that she was hospitalized fro psychiatric reasons eight times for a total of seventy-seven days during the June 22 to December 16, 2008 period.  The hospitalizations lasted from two to eight days on six occasions, thirteen days on one occasion, and twenty-three days on one occasion.  Hospital records show that she was diagnosed with bipolar disorder and that her primary stressors were a pending divorce and a custody dispute.
>
> However, the medical record for the post-December 16, 2008 period does not

show any psychiatric hospitalization, while an evaluation of the claimant's mental status conducted at Psych Care Consultants in January 2009 did not demonstrate any deficits or abnormalities other than a mildly depressed mood and some anxiety. The medical record for the post-February 2009 period does not show that the claimant made any visits to a psychiatrist, psychologist, or even a therapist. Her only mental health treatment in this period was medication prescribed by a physician, Dr. Dean, who noted in October 2009 that her bipolar disorder was "very stable except for insomnia," the insomnia apparently being due to the claimant's discontinuance of Seroquel.

(Tr. 19) (internal citations omitted). The ALJ opined that her mental impairments did not

significantly limit her ability to perform basic work activities beyond that considered in the RFC.

First, Claimant never alleged that her mental impairments were disabling, and she

presented no medical evidence substantiating this claim. Indeed, the medical evidence is devoid of

any support. As noted by the ALJ, Dr. Dean found her bipolar disorder to be stable except for

insomnia caused by her discontinuance of Seroquel..[3]

In her decision the ALJ thoroughly discussed the medical evidence of record, lack of

mental restrictions, activities of daily living, and inconsistencies in the record. See Gray v. Apfel,

___

[3]As noted by the ALJ, Claimant's increased symptoms coincided with times of high stress. Indeed, the treatment notes show that Claimant's condition improved with treatment with situational stressors such as occupational problems, legal problems, custody dispute, marital stress, child-related issues, and marital separation and pending divorce causing increased symptoms. Indeed, Claimant reported increased depression after being served her divorce papers the day prior to admission during treatment at CenterPointe Hospital. She complained of her depression increasing over the last six months due to marital discord and loss of her child from a custody dispute. The undersigned finds based on the medical record her depression to be somewhat situational. Situational depression, however, is not disabling. See Gates v. Astrue, 627 F.3d 1080, 1082 (8th Cir. 2010) (ALJ properly found depression not disabling where it "was situational in nature, related to marital issues, and improved with a regimen of medication and counseling); Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (holding that depression was situational and not disabling because it was due to denial of food stamps and workers compensation and because there was no evidence that it resulted in significant functional limitations). In the February 8,treatment note, she reported having "little in way of depressed moods for many days at a time."

192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The ALJ then addressed several inconsistencies in the record to support his conclusion that Claimant's complaints were not credible.

Specifically, the ALJ noted that no treating physician in any treatment notes stated that Claimant was disabled or unable to work or imposed mental limitations on Claimant's capacity for work. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The absence of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012); Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). Further, the ALJ noted that Claimant first was seen for psychiatric evaluation in June 2008.

Likewise, the ALJ noted how the medical record is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment after December 2008. Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive

medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993)( lack of ongoing treatment is inconsistent with complaints of disabling condition). The medical record shows that after December 16, 2008, Claimant did not have any psychiatric hospitalizations, and the medical record she only had a mildly depressed mood and some anxiety. Claimant did not seek any treatment from a psychiatrist, psychologist, or therapist during that time. Dr. Dean prescribed medication and he found on October 26, 2009 Claimant's bipolar "very stable except for insomnia since off Seroquel."

The ALJ also properly considered the inconsistencies between Claimant's allegations and her daily activities. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001) ("[i]nconsistencies between subjective complaints of pain and daily living patterns diminish credibility"); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (finding that activities such as driving, shopping, watching television, and playing cards were inconsistent with the claimant's complaints of disabling pain). Another inconsistency in the record would be Claimant's testimony regarding her inability to walk more than fifty feet at a time or stand more than thirty minutes at a time as she testified at the hearing. A review of the record shows she never reported such limitations during treatment. Contradictions between a claimant's sworn testimony and what he actually told physicians weighs against the claimant's credibility. Karlix v. Barnhart, 457 F.3d 742, 748 (8th Cir. 2006) (finding a lack of credibility when claimant's testimony regarding drinking consumption conflicted with medical documentation). As such, the undersigned finds that the discrepancies between Claimant's testimony and what she told doctors is supported by substantial evidence.

After engaging in a proper credibility analysis, the ALJ incorporated into Claimant's RFC those impairments and restrictions found to be credible. See McGeorge v. Barnhart, 321 F.3d

766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the

impairments and limitations he found credible based on his evaluation of the entire record.").  The

ALJ determined that the medical evidence supported a finding that Claimant could perform

a limited range of unskilled light work.  The ALJ further noted she is able to understand,

remember and carry out at least simple instructions and non-detailed tasks.  The vocational expert

testified in response to hypothetical questions, that incorporated the same limitations as the RFC,

and opined that such individual could perform work as an order caller and a mail clerk.

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied

relief solely on the lack of objective medical evidence to support her finding that Claimant is not

disabled.  Instead, the ALJ considered all the evidence relating to Claimant's subjective

complaints, including the various factors as required by Polaski, and determined Claimant's

allegations not to be credible.  Although the ALJ did not explicitly discuss each Polaski factor in

making his credibility determination, a reading of the decision in its entirety shows the ALJ to

have acknowledged and considered the factors before discounting Claimant's subjective

complaints.  See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).  Inasmuch as the ALJ

expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a

whole, and the ALJ's determination is supported by substantial evidence, such determination

should not be disturbed by this Court.  Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996).

Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not

entirely credible, the undersigned defers to the ALJ's credibility findings.  See Leckenby v. Astrue,

487 F.3d 626, 632 (8th Cir. 2007) (deference given to ALJ's credibility determination when it is

supported by good reasons and substantial evidence); Guilliams v. Barnhart, 393 F.3d 798,

801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before her and set out the inconsistencies detracting from Claimant's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. See Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence). Those included Claimant's lack of mental restrictions, activities of daily living, the medical evidence of record, and inconsistencies in the record. The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints of pain. See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)(affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain).

The substantial evidence on the record as a whole supports the ALJ's decision. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**. Judgment shall be entered accordingly.


_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this __26th__ day of September, 2014.